# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| ROMA LANDMARK THEATERS, LLC and MCC ENTERTAINMENT LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2019-0585-PAF |
| COHEN EXHIBITION COMPANY LLC, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) ) | |
| COHEN EXHIBITION COMPANY LLC, | ) ) | |
| Counterclaim-Plaintiff, | ) ) | |
| v. | ) ) | |
| ROMA LANDMARK THEATERS, LLC, MCC ENTERTAINMENT LLC, and SCHUYLER HANSEN, | ) ) ) ) | |
| Counterclaim-Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: June 12, 2020
Date Decided: September 30, 2020

Garrett B. Moritz and Anne M. Steadman, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Marshall R. King and Hannah E. Kirshner, GIBSON, DUNN & CRUTCHER LLP, New York, New York; *Attorneys for Plaintiffs and Counterclaim Defendants.*

Kevin M. Gallagher and Angela Lam, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Donald A. Harwood and Simon W. Reiff, HARWOOD REIFF LLC, New York, New York; *Attorneys for Defendant and Counterclaim Plaintiff.*

**FIORAVANTI, Vice Chancellor**

This action arises from a disagreement over post-closing price adjustments to a corporate acquisition. Under the parties' purchase agreement, the company calculated certain financial metrics to determine initial adjustments to the purchase price and provided them to the buyer. The buyer updated the calculations after closing to determine a final adjustment to the purchase price. The purchase agreement detailed how the financial metrics would be calculated. The agreement required the parties to submit any dispute over the calculations to an independent accounting firm for a conclusive and binding determination.

The parties disagreed over post-closing adjustments and submitted their dispute to the accounting firm. The accounting firm largely ruled in favor of the sellers. The sellers then filed this action, requesting an order confirming the accounting firm's decision and requiring the buyer to release funds which had been escrowed to satisfy any final purchase price adjustment. The buyer responded with counterclaims, alleging that the sellers have engaged in financial disclosure misrepresentations amounting to fraud and bad faith. The sellers have moved for summary judgment on their affirmative claims and to dismiss the buyer's counterclaims.

This Opinion grants the motion to dismiss in part and denies the motion for summary judgment.

## I. BACKGROUND

The facts recited in this opinion are drawn from the Verified Complaint (Dkt. 1) (the "Complaint" or "Compl."), the Answer (Dkt. 24) (the "Answer" or "Ans."), the Verified Amended Counterclaims (Dkt. 24) (the "Counterclaims" or "Countercl."), documents integral thereto, and matters of which the Court may take judicial notice.

### A. The Purchase Agreement

On December 3, 2018, Plaintiffs Roma Landmark Theaters, LLC ("Roma") and MCC Entertainment LLC ("MCC") sold Landmark Acquisition Corporation ("Landmark" or the "Company") to Defendant Cohen Exhibition Company LLC (the "Buyer") pursuant to a Securities Purchase Agreement (the "Purchase Agreement").[1] The Counterclaims allege that Counterclaim Defendant Schuyler Hansen was the Chief Financial Officer and Manager of Roma and MCC, and the Chief Financial Officer of the Company at the time of the sale.[2] Unless otherwise noted, Roma, MCC, and Hansen are referred to herein as the "Sellers."

---

[1] Compl. ¶ 12; Ans. ¶ 12. The Purchase Agreement is attached as Exhibit A to the Complaint.

[2] The record does not contain a single authoritative source establishing the titles that Hansen held at Roma, MCC, and the Company. *See* Countercl. ¶ 10 (alleging that Hansen was the Sellers' CFO and Manager); *id.* ¶ 34 (alleging that Hansen was the Company's CFO prior to the sale); Hansen Decl. ¶ 1 (Dkt. 19) (identifying Hansen as the Manager of Roma); Determination Letter 1 (identifying Hansen as the Chief Financial Officer of both Roma and MCC); Purchase Agreement Schedule 1.5(b)(iv) (identifying Hansen as the Company's CFO and Treasurer).

4

The Counterclaims largely implicate two categories of Purchase Agreement provisions: (1) the purchase price adjustment mechanism; and (2) the Sellers' and the Company's respective representations and warranties.

### 1. The Purchase Price Adjustments

Under the Purchase Agreement, Buyer agreed to purchase the Company for $148,800,000, subject to adjustments at and after closing. Pursuant to the Purchase Agreement, Buyer placed $3 million of the purchase price into an escrow account to satisfy any post-closing adjustments.[3] At closing, the price was adjusted based on financial metrics in a Preliminary Closing Statement that the Company provided to Buyer shortly before closing. The Preliminary Closing Statement contained estimates of the Company's Net Working Capital, Indebtedness, Cash, and Company Transaction Expenses as of the closing date.[4] After closing, pursuant to the Purchase Agreement, the Buyer provided a Final Closing Statement to the Sellers

---

[3] Purchase Agreement 38 (defining "Closing Payment" as the "Estimated Net Purchase Price Amount" minus the "Adjustment Escrow Amount" and the "Adjustment Escrow Amount" as $3,000,000); 40 (defining "Estimated Net Purchase Price Amount" as the "Enterprise Value" taking into account the financial metrics); 39 (defining "Enterprise Value" as $148,800,000); *see also id.* § 1.6; Compl. ¶ 13 (establishing $3 million escrow for post-closing adjustments). The Escrow Agreement is attached as Exhibit C to the Complaint.

[4] Purchase Agreement § 1.3(a).

containing a revised price adjustment, reflecting Buyer's updated calculations of the same financial metrics.[5]

The parties agreed that the financial metrics in the Preliminary and Final Closing Statements would be calculated pursuant to instructions in a Company Disclosure Letter attached to the Purchase Agreement (the "Applicable Accounting Principles").[6]  The Applicable Accounting Principles provided that the Preliminary and Final Closing Statements would be prepared using: (1) the terms of the Purchase Agreement, (2) a list of "Specific Policies," and (3) the accounting methodology used by the Company in preparing certain prior financial statements (the "Interim Financial Statements").[7]  If the Purchase Agreement, the Specific Policies, or the

---

[5] *Id.* § 1.3(b).

[6] *Id.* § 1.3(a) ("Estimated Net Working Capital, Estimated Indebtedness, Estimated Cash and Estimated Company Transaction Expenses shall be calculated on a basis consistent with Section 1.3(a) of the Company Disclosure Letter and the accounting principles, practices, assumptions, conventions and policies referred to therein (the 'Applicable Accounting Principles')").  The Company Disclosure Letter is attached as Exhibit 3 to the Declaration of Schuyler Hansen, and the Applicable Accounting Principles are set forth at Section 1.3 of the Company Disclosure Letter (Dkt. 19 Ex. 3).  *See*  Lou R. Kling & Eileen T. Nugent, Negotiated Acquisitions of Companies, Subsidiaries and Divisions § 17.02 at 17–23 (2020 ed.) (discussing mechanisms to calculate post-closing purchase price adjustments and recommending "adequate pre-signing due diligence into the accounting principles and policies underlying the financial statements of the business being acquired and express agreements between the parties as to any deviations from these principles and policies that are to be applicable to the preparation of the closing date balance sheet").

[7] Company Disclosure Letter § 1.3; *see also* Purchase Agreement § 4.6(a) (defining "Interim Financial Statements" as "the combined consolidated statements of operations of the Company and its Subsidiaries, for the twelve (12) months ended December 28, 2017 and the ten (10) months ended October 25, 2018").

Interim Financial Statements did not address a particular calculation, the Preliminary and Final Closing Statements were to be prepared according to generally accepted accounting principles ("GAAP").[8] To further guide the process, the Purchase Agreement attached a document illustrating how each of the financial metrics would be calculated (the "Sample Statement"). The parties agreed in the Specific Policies that all calculations of Net Working Capital would "include only those accounts and line items set forth in the Sample Statement."[9]

If the parties could not resolve a dispute over the calculations in the Final Closing Statement, the Purchase Agreement required that an independent accounting firm would decide the dispute.[10] The accounting firm's review was limited to determining whether the calculations had been correctly performed and whether the calculations were made pursuant to the Applicable Accounting Principles and the

---

[8] Company Disclosure Letter § 1.3. The parties also agreed that, in the event of any conflict, (1) the Purchase Agreement would supersede the Specific Policies and the methodologies used to prepare the Interim Financial Statements, and (2) the Specific Policies would supersede the methodologies used to prepare the Interim Financial Statements. *Id.*

[9] Company Disclosure Letter at Specific Policy (e). The Sample Statement is attached as Exhibit A to the Applicable Accounting Principles. It is also attached as Exhibit A to the Purchase Agreement.

[10] Purchase Agreement § 1.3(d).

Sample Statement.[11]  The accounting firm's determination was "conclusive and binding upon the parties" and is "not . . . subject to appeal or further review."[12]  The parties also agreed that they would pay the costs of "any dispute resolution . . . including the fees and expenses of the Independent Accounting Firm and of any enforcement of the determination thereof" proportionally to the degree of their success, as calculated by the accounting firm.[13]

### 2. Pertinent Representations and Warranties

Article III of the Purchase Agreement contains Sellers' representations and warranties.  Article III does not make any representations or warranties about the accuracy of any financial statements or the Preliminary Closing Statement.  In Section 3.6 of the Purchase Agreement, Sellers expressly disclaim any representations outside of the representations made in Article III, except as modified

---

[11] *Id.* ("The scope of the disputes to be resolved by the Independent Accounting Firm shall be limited to correcting mathematical errors and determining whether the items and amounts in dispute were determined in accordance with the Applicable Accounting Principles and the Sample Statement, and the Independent Accounting Firm is not to make any other determination, including any determination as to whether the Target Net Working Capital or any estimates on the Preliminary Closing Statement are correct, adequate or sufficient.").

[12] *Id.* ("Judgment may be entered upon the written determination of the Independent Accounting Firm in accordance with Section 8.10."); *see also id.* § 8.10 (forum selection clause selecting Delaware courts for all actions "arising out of or relating to this Agreement or the transactions contemplated hereby").

[13] *Id.* § 1.3(e).

by the Company Disclosure Letter.[14]  With respect to Article III, the Company Disclosure Letter modifies the Sellers' representations in Sections 3.4 and 3.5, which are not relevant to the claims addressed in this Opinion.[15]

Article IV of the Purchase Agreement separately states the Company's representations and warranties.  Section 4.6(a) makes representations and warranties as to the Interim Financial Statements, stating that each financial statement:

> (i) has been prepared based on the books and records of the Company . . . except as may be indicated in the notes thereto, (ii) has been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto) and (iii) fairly presents, in all material respects, the consolidated or combined financial position and results of operations of the Company and WSH HoldCo, Inc., and their respective Subsidiaries (as applicable), as at the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein and subject, in the case of the Interim Financial Statements, to normal year-end adjustments and the absence of notes.[16]

---

[14] *Id.* § 3.6 ("Neither such Seller nor any of its Affiliates, nor any of its or their respective Representatives is making any representation or warranty on behalf of, or otherwise relating to, such Seller of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this Article III (as modified by the Company Disclosure Letter) and such Seller hereby disclaims any such other representations or warranties.").

[15] The Company Disclosure Letter contains a table showing the Sellers' equity interests in the Company, as referenced in Section 3.4, and a table listing one broker entitled to a brokerage, finder's, or similar fee, as referenced in Section 3.5.  Company Disclosure Letter §§ 3.4, 3.5.

[16] Purchase Agreement § 4.6(a).

In Section 2.6 of the Purchase Agreement, Buyer agreed that it had been "provided with full and complete access" to the Company's books and records.[17] It also expressly disclaimed any reliance upon any representation or warranty or statement (including by omission) outside of Articles III and IV, as modified by the Company Disclosure Letter. Section 2.6 states, in pertinent part:

> The Buyer is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Company and its Subsidiaries and the transactions contemplated hereby . . . . The Buyer and its Representatives have been provided with full and complete access to the . . . books and records . . . that they have requested . . . . The Buyer has not relied and is not relying on any statement (including by omission), representation or warranty, oral or written, express or implied, made by or on behalf of any Seller, the Company, or any of their respective Affiliates . . . and each of the Sellers and the Company . . . expressly disclaim any and all liability that may be based on such information or errors therein or omissions therefrom, except as expressly and specifically set forth in Article III (as modified by the Company Disclosure Letter), with respect to representations made by a Seller as to itself, and Article IV (as modified by the Company Disclosure Letter) with respect to representations made by the Company as to itself and its Subsidiaries. None of the Sellers, the Company or any of their respective . . . directors, officers, employees, [or] equity holders . . . shall have any liability to the Buyer or any other Person resulting from the use of, or any reliance on, any information, documents or materials made available to the Buyer . . . . None of the Sellers, the Company or their Affiliates, or any of their respective directors, officers, employees, equity holders . . . has made, directly or indirectly, any representation or warranty or statement (including by omission) with respect to the accuracy or completeness of any such information, documents or materials made available to (or otherwise acquired by) the Buyer . . . .[18]

---

[17] *Id.* § 2.6.

[18] *Id.*

In Section 8.1 of the Purchase Agreement, the parties agreed that the parties' representations and warranties in the Purchase Agreement expired upon closing:

> The respective representations, warranties, covenants and agreements of the Sellers, the Company and the Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided, that this Section shall not limit any covenant or agreement of the parties that by its terms requires performance after the Closing. In no event following the Closing shall the Buyer or the Company or their respective Affiliates have any recourse against (a) any Persons who were stockholders, equity holders, members or other direct or indirect beneficial owners of the Company prior to the Closing with respect to matters relating to the Company or (b) the former directors or officers of the Company or its Subsidiaries, or any Affiliates or Representatives of any of the foregoing Persons, in each case with respect to any representation, warranty, covenant or agreement made by the Company in this Agreement.[19]

The Buyer's Counterclaims do not directly allege a breach of the representations and warranties in the Purchase Agreement. Rather, Buyer alleges that Sellers breached Sections 1.3(a) and 6.3(b) of the Purchase Agreement.[20] Section 1.3(a) is part of the purchase price adjustment mechanism. It requires the Company to prepare the Preliminary Closing Statement using good faith estimates of the financial metrics used to calculate the price adjustments, subject to the parties' agreement regarding the Applicable Accounting Principles and the Sample Statement. It states, in pertinent part:

---

[19] *Id.* § 8.1.

[20] Countercl. ¶ 19.

11

On or prior to the Closing Date . . . the Company shall prepare . . . and deliver to the Buyer [the "Preliminary Closing Statement"] setting forth (i) a good-faith estimate of the Company's (A) Net Working Capital . . . (B) Indebtedness . . . (C) Cash . . . and (D) Company Transaction Expenses . . . each determined as of 11:59 p.m. on the day prior to the Closing Date . . . based on the Company's books and records and other information available at the Closing and (ii) on the basis of the foregoing, a calculation of the Estimated Net Purchase Price Amount and the Closing Payment. Estimated Net Working Capital, Estimated Indebtedness, Estimated Cash and Estimated Company Transaction Expenses shall be calculated on a basis consistent with Section 1.3(a) of the Company Disclosure Letter and [the "Applicable Accounting Principles" therein]. An illustrative example of a Preliminary Closing Statement and calculation of Net Working Capital, Indebtedness, Cash and Company Transaction Expenses is set forth as Exhibit A (the "Sample Statement").[21]

Section 6.3(b) is contained in Article VI of the Purchase Agreement, entitled

"Conditions to Closing," and states:

The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by the Buyer in its sole discretion:

* * *

(b) The Sellers and the Company shall have performed all obligations and agreements and complied with all covenants and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing.[22]

---

[21] Purchase Agreement § 1.3(a).

[22] *Id.* § 6.3(b).

**B.    The Parties Dispute the Post-Closing Adjustments.**

On February 7, 2019, Buyer delivered the Final Closing Statement to the Sellers.[23]   On March 7, 2019, Sellers gave notice to Buyer that Sellers disputed certain calculations in Buyer's Final Closing Statement.[24]   The parties engaged PricewaterhouseCoopers LLP ("PwC") to serve as the independent public accounting firm to resolve the disputes and submitted statements of their respective positions to PwC.[25]   PwC propounded interrogatories and document requests to the parties to obtain additional information to assist it in its determination.[26]

On June 28, 2019, PwC issued its Determination Letter resolving the Final Closing Statement disputes.[27]   The Determination Letter resolved the disputes in Sellers' favor, except that PwC agreed with Buyer's calculation of the Company's

---

[23] Compl. ¶ 14; Ans. ¶ 14.

[24] Compl. ¶ 15; Purchase Agreement § 1.3(c).

[25] Compl. ¶¶ 14–15; *see also* Compl. Ex. D (PwC's engagement letter).   The Purchase Agreement indicates that "the Independent Accounting Firm shall be BDO Siedman or, if such firm is unable or unwilling to act, such other independent public account firm as shall be agreed in writing by the Sellers and the Buyer."   Purchase Agreement § 1.3(d). PwC was retained after BDO Siedman was determined to have a conflict of interest. Cherniak Aff. ¶ 19 (Dkt. 26).

[26] Compl. Ex. B at 3.

[27] PwC referred to its written decision as the "Determination Letter," and this Opinion uses that defined term hereinafter.   The Determination Letter is attached as Exhibit B to the Complaint.

13

cash as of the closing date.[28] Sellers requested that Buyer instruct the escrow agent to release funds pursuant to PwC's determination. Buyer refused.[29]

### C. This Action

On July 29, 2019, Sellers filed the Complaint seeking (1) a judgment enforcing PwC's Determination Letter as a binding arbitration award under the Federal Arbitration Act (Compl. Count I);[30] and (2) an order of specific performance requiring Buyer to release the escrowed amounts pursuant to the Determination Letter, plus Sellers' costs of enforcement (Compl. Count II).[31]

On September 13, 2019, Buyer filed an Answer and Verified Counterclaims, which were amended on January 13, 2020. The Counterclaims allege that Sellers, through their fellow Counterclaim-Defendant Hansen as an officer of the Sellers and the Company, engaged in bad faith and fraudulent conduct. Buyer alleges that Sellers acted fraudulently and in bad faith by failing to maintain a reserve against an accounts receivable balance for payments from Moviepass, a ticket subscription

---

[28] Determination Letter 6–11 & 13–15 (resolving calculation disputes in Sellers' favor); *id.* at 12 (resolving the dispute regarding Closing Cash in Buyer's favor).

[29] Compl. ¶¶ 26–27.

[30] *Id.* ¶¶ 28–35.

[31] *Id.* ¶¶ 36–42; Request for Relief ¶ b (requesting an order "directing specific performance of Cohen's obligations under the Purchase Agreement and the Escrow Agreement to . . . execute a Joint Instruction Letter releasing funds to Plaintiffs in the amount of $2,621,623, plus any interest accrued in the Escrow Account since May 31, 2019, plus Plaintiffs' costs of enforcement, plus prejudgment interest").

business, in the Company's Interim Financial Statements or in the Preliminary Closing Statement. According to Buyer, Sellers knew that Moviepass was experiencing financial distress,[32] but did not record a reserve. Buyer further alleges that Sellers did not properly record outstanding checks from a particular bank account ("Account #1000-035") as accounts payable or otherwise disclose them to Buyer as liabilities in the Preliminary Closing Statement, even though Buyer listed outstanding checks as liabilities in its Interim Financial Statements.[33]

The dispute over the Moviepass receivable and outstanding checks were among the issues previously presented to PwC. The Buyer's Final Closing Statement recorded a 50% reserve to the Moviepass accounts receivable and reclassified the outstanding checks as liabilities. PwC rejected Buyer's argument and resolved the disagreement in Sellers' favor. PwC determined that the Buyer's treatment of the Moviepass accounts receivable and the outstanding checks in the Final Closing Statement was inconsistent with the Purchase Agreement.[34] Despite PwC's determination, Buyer argues that the Determination Letter does not bar its

---

[32] Countercl. ¶¶ 7–11.

[33] *Id.* ¶¶ 12–22.

[34] Determination Letter 6–7 (determining that Buyer had not acted consistently with the Sample Statement by reclassifying outstanding checks as accounts payable in the Final Closing Statement and stating: "Buyer's proposed Moviepass accounts receivable reserve was not in accordance with the Specific Policies.").

15

claims because PwC had no authority to determine whether Sellers acted fraudulently or in bad faith.

The Counterclaims also assert claims that were, allegedly, not presented to PwC. The Counterclaims allege that, after PwC issued the Determination Letter, Buyer learned about multiple categories of liabilities that were excluded from the Interim Financial Statements and the Preliminary Closing Statement. Specifically, Buyer alleges that Sellers acted improperly by failing to disclose (1) more than $750,000 of merit and incentive bonuses for field management personnel (the "Management Bonus Liabilities"); (2) approximately $500,000 of medical claim liabilities known to Sellers prior to closing (the "Medical Claim Liabilities"); and (3) approximately $175,000 of under-accrued state income taxes, approximately $60,000 worth of expense reports, and a write-off of a receivable of approximately $40,000 (the "Miscellaneous Liabilities").[35]

Buyer's counterclaims are reflected in four separate counts: (1) breach of contract for failure to provide good faith estimates of the Company's financial metrics pursuant to Section 1.3 (Countercl. Count I);[36] (2) fraud (Countercl. Count

---

[35] Countercl. ¶¶ 25–26.

[36] *Id.* ¶¶ 27–32.

II);[37] (3) fraudulent concealment (Countercl. Count IV);[38] and (4) breach of the implied covenant of good faith and fair dealing (Countercl. Count V).[39] The parties briefed Sellers' motion to dismiss the Counterclaims and motion for summary judgment, and on June 12, 2020, the Court heard oral argument on the motions.

## II. ANALYSIS

### A. Sellers' Motion to Dismiss

Sellers have moved to dismiss Buyer's counterclaims in their entirety. The pleading standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) are minimal. *Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011). On a motion to dismiss for failure to state a claim:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal citations and quotation marks omitted); *accord Central Mortg.*, 27 A.3d at 536. "[A] trial court is required to accept only those 'reasonable inferences that logically flow from the

---

[37] *Id.* ¶¶ 33–38.

[38] *Id.* ¶¶ 39–44. There is no Count III in the amended counterclaims.

[39] *Id.* ¶¶ 45–51.

face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'" *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)). "Moreover, a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede*, 780 A.2d at 1083.

This Opinion first addresses Buyer's contract claims in Count I (breach of contract) and Count V (breach of the implied covenant of good faith and fair dealing). The Opinion then addresses Buyer's fraud claims in Count II (fraud) and Count IV (fraudulent concealment).

### 1. Buyer's Contract Claims

### a. Breach of Contract (Count I)

"To survive a motion to dismiss, a complaint stating a claim for breach of contract must identify a contractual obligation . . . a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1995 WL 662685, at *7 (Del. Ch. Nov. 2, 1995). "'Delaware adheres to the 'objective' theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party.'" *Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson*

18

*Commc'ns Corp.*, 2005 WL 1038997, at \*5 (Del. Ch. Apr. 29, 2005)); *accord*

*Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014).

Buyer does not directly allege that Sellers breached the Company's financial disclosures in the representations and warranties of the Purchase Agreement. Rather, Buyer attempts to do so indirectly, alleging breaches of two other contract provisions.[40]  First, Buyer claims that Sellers breached Section 1.3 of the Purchase Agreement, which required the Company to provide good faith estimates of financial metrics in the Preliminary Closing Statement.  Second, Buyer claims Sellers breached a representation or covenant in Section 6.3(b) that the financial information provided by the Company to Buyer was accurate.

In essence, Buyer argues that these provisions should serve as "backup" representations and warranties by the Sellers regarding the Company's finances because Sellers did not make any representations or warranties regarding the Company's financial disclosures in the Purchase Agreement.  Rather, in Section 4.6(a), the Company (not the Sellers) represented and warranted that the Interim Financial Statements had been prepared "based on the books and records of the Company" and "in accordance with GAAP applied on a consistent basis throughout

---

[40] Defendant concedes that Hansen is not liable for breach of contract or for a breach of the implied covenant of good faith and fair dealing because Hansen was not a party to the Purchase Agreement.  Buyer's Ans. Br. in Opp'n to Mot. to Dismiss 42 n.2.

19

the periods indicated."[41]   In the same section, the Company further warranted that the Interim Financial Statements "fairly present[], in all material respects, the consolidated or combined financial position and results of operations of the Company . . . as at the respective dates thereof and for the respective periods indicated therein."[42]   The parties expressly agreed that the representations and warranties terminated upon closing and barred any recourse by the Buyer against the former owners of the Company.[43]

In Section 1.3, outside of the representations and warranties described in Articles III and IV of the Purchase Agreement, the Company agreed that it would provide the Preliminary Closing Statement to the Buyer for purposes of calculating an initial price adjustment that would subsequently be revised by the Buyer after closing and reflected in the Final Closing Statement.  The typical purpose of post-closing price adjustments is to "account for changes in [the] business between . . . signing and closing."  *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec.*

---

[41] Purchase Agreement § 4.6(a).

[42] *Id.  See Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1041–42 (Del. Ch. 2006) (analyzing a purchase agreement in which the "key representation and warranty" was "made only by the Company and not by the Seller").  In *Abry Partners*, this Court held that it was "legitimate for the Seller to create exculpatory distance between itself and the Company" by dividing the representations in this manner so that the buyer would be required to "hold the Company and its speaking managers exclusively responsible for their own misstatements of fact."  *Id.* at 1063.

[43] Purchase Agreement § 8.1.

*Co. LLC*, 166 A.3d 912, 928 (Del. 2017); *see also id.* ("Buyers want protection against value depletion before they take over the business, and, at the same time, sellers want to ensure that they will be compensated for effectively running the business.").

<blockquote>

**i.      The Counterclaims Do Not State a Claim for Breach of Section 1.3 of the Purchase Agreement.**

</blockquote>

Section 1.3(a) requires the Company, rather than Sellers, to prepare the Preliminary Closing Statement.  It states:

> [T]he Company shall prepare, or cause to be prepared, and deliver to the Buyer a statement (the "Preliminary Closing Statement") setting forth (i) a good-faith estimate of the Company's (A) Net Working Capital (the "Estimated Net Working Capital"), (B) Indebtedness (the "Estimated Indebtedness"), (C) Cash (the "Estimated Cash") and (D) Company Transaction Expenses (the "Estimated Company Transaction Expenses") [as of the closing date].[44]

Section 1.3(a) does not obligate the Sellers to prepare the Preliminary Closing Statement or to provide good faith estimates of the Company's financial metrics. The obligations of Sellers and the Company are not interchangeable in the Purchase Agreement.  *See Abry*, 891 A.2d at 1063 (noting that parties to an agreement apportioned representations between the company and the seller of the company because "[t]he Seller did not necessarily possess the same information as the managers of the Company").  Having agreed that the Company owed the obligation

---

[44] Purchase Agreement § 1.3(a).

to prepare the Preliminary Closing Statement, Buyer cannot now argue that Sellers owed the contractual obligation to prepare and deliver the Preliminary Closing Statement pursuant to the Purchase Agreement with the attendant contractual liability for breach.

In its briefing, Buyer's only counterargument is that "a seller *may* be held liable for the company's fraudulent misrepresentations in a stock purchase agreement."[45] Buyer cites no case law, however, for the proposition that a contracting party may be held liable for breach of contract for failure to disclose information that another party was obligated to disclose.[46] To hold that Sellers owed the contractual obligation to prepare the Preliminary Closing Statement in good faith would be to rewrite the parties' contract, and Buyer makes no argument that doing so would be appropriate here. *See JPMorgan Chase & Co. v. Am. Century Cos., Inc.*, 2012 WL 1524981, at *6 (Del. Ch. Apr. 26, 2012) (dismissing breach of contract claim because plaintiffs failed to cite any term of the contract obligating defendant to provide the disclosure allegedly required). Buyer's claim that Sellers breached Section 1.3(a) of the Purchase Agreement is therefore dismissed.

---

[45] Buyer Ans. Br. in Opp'n to Mot. to Dismiss 43 (emphasis in original).

[46] *See* Oral Arg. Tr. at 59 (counsel for Buyer confirming same) (Dkt. 70).

### ii. The Complaint Fails to Allege that Sellers Breached Section 6.3(b).

Buyer alleges that Sellers breached Section 6.3(b) of the Purchase Agreement. This claim is based on the same alleged financial misrepresentations underlying the alleged breach of Section 1.3(a).[47]  Section 6.3(b) states: "[T]he Sellers and the Company shall have performed all obligations and agreements and complied with all covenants and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing."[48]  Buyer characterizes Section 6.3(b) as a "disclosure requirement[]" and a "representation . . . that the interim financial statements were accurate as of the dates thereof."  *See* Buyer's Ans. Br. in Opp'n to Mot. to Dismiss 20, 44.  Elsewhere, Buyer contends that "[t]he promises made in Section 6.3(b) . . . most certainly were covenants" because it purportedly contains a "promise that accurate disclosures in good faith would occur[.]"  *Id.* 46–47.

Buyer's various characterizations of Section 6.3(b) do not sustain a claim for breach of contract.  Section 6.3(b) is a condition to closing, not (as Buyer claims) a representation and warranty of financial disclosures or a covenant that accurate

---

[47] *See* Countercl. ¶ 19 ("In agreeing to close, Buyer relied on the truth and accuracy of the interim financial statements and the Preliminary Closing Statement and that Sellers would abide by their obligation under Section 1.3(a) of the Purchase Agreement to prepare such statements in good faith, as well as their representation under Section 6.3(b) that the interim financial statements were accurate as of the dates thereof.").

[48] Purchase Agreement § 6.3(b).

financial disclosures would be provided. "[T]he non-occurrence of a condition is not considered a breach unless the party promised that the condition would occur." *TravelCenters of Am. LLC v. Brog*, 2008 WL 5272861, at *3 (Del. Ch. Dec. 5, 2018). Here, Buyer has neither pleaded nor demonstrated through briefing how Section 6.3(b)—either by its terms or by reference to other provisions in the Purchase Agreement—obligates the Sellers to provide true and accurate representations regarding the Company's financial disclosures.

In alleging claims for breach of Sections 1.3(a) and 6.3(b), Buyer has sought to circumvent the clear contractual limitations that prevent a direct claim for breach of the Company's financial representations. Under the Purchase Agreement, the Company, rather than the Sellers, provided representations and warranties regarding the Company's financial statements.[49] The truth and correctness of the representations and warranties were part of a condition to closing in Section 6.3(a),

---

[49] Purchase Agreement § 4.6(a)(iii) (representing that financial statements "fairly present[], in all material respects, the consolidated or combined financial position and results of operations"). *Cf. Abry*, 891 A.2d at 1041–44 (analyzing a situation in which a Stock Purchase Agreement contained a representation regarding financial statements by the company rather than the seller).

rather than Section 6.3(b).[50]  In addition, the Company's representations, warranties, and covenants terminated upon closing.[51]  Having agreed to those terms, Buyer cannot create new free-floating contractual protections that it did not bargain for through an unrelated provision of the Purchase Agreement.  *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("Parties have a right to enter into good and bad contracts, the law enforces both.").  Buyer has not stated a claim that Sellers breached the Purchase Agreement.

### b.  Breach of the Implied Covenant (Count V)

Count V asserts a claim for breach of the implied covenant of good faith and fair dealing.  Buyer alleges the Sellers breached the implied covenant by "providing misleading financial metrics, which significantly overstated the Company's

---

[50] Purchase Agreement § 6.3(a) ("The representations and warranties of the Sellers and the Company contained in Articles III and IV shall be true and correct both when made and as of the Closing Date, except that in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date, except where the failure to be so true and correct (without giving effect to any limitation or qualification as to 'materiality' (including the word 'material'), 'Seller Material Adverse Effect' or 'Material Adverse Effect' set forth therein, other than those limitations and qualifications contained in Section 4.7(b) and Section 4.17(a)) would not have or reasonably be expected to have a Seller Material Adverse Effect or Material Adverse Effect, as applicable.").

[51] Purchase Agreement § 8.1.  "'[W]here the contract expressly provides that the representations and warranties terminate upon closing . . . the parties have made clear their intent that they can provide no basis for a post-closing suit seeking a remedy for an alleged misrepresentation.  That is, when the representations and warranties terminate, so does any right to sue on them.'"  *Chicago Bridge*, 166 A.3d at 932–33 (quoting *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *13 (Del. Ch. July 11, 2011)).

Accounts Receivable, and grossly understated its Accounts Payable, both in the interim financial statements and in the Preliminary Closing Statement."[52]

The implied covenant of good faith and fair dealing inheres in every contract governed by Delaware law and requires "'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain."[53] "[T]he implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract." *Alliance Data Sys. Corp. v. Blackstone Capital P'rs V L.P.,* 963 A.2d 746, 770 (Del. Ch.), *aff'd,* 976 A.2d 170 (Del. 2009) (TABLE). "The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009); *see also Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 504 n.93 & 506–07 (Del. 2019) (discussing the application of the implied covenant of good faith and fair dealing).

---

[52] Countercl. ¶ 47.

[53] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985)).

Buyer neither alleges in its Counterclaims nor argues in its brief that there is a contractual gap or unanticipated development in the Purchase Agreement that should be addressed through application of the implied covenant of good faith and fair dealing. Rather, Buyer argues that its implied covenant claim should survive as an alternative to its primary breach of contract claim because "Delaware courts routinely deny dismissal of breach of covenant of good faith and fair dealing claims . . . prior to discovery."[54]

Claims for the implied covenant of good faith and fair dealing are not immune from dismissal at the pleadings stage, especially where, as here, the claimant has not alleged an implied obligation or a contractual gap. *See Winshall v. Viacom Int'l., Inc.*, 76 A.3d 808, 816 (Del. 2013) (affirming dismissal of an implied covenant claim at the motion to dismiss stage because "no such obligation can be implied under" the contract); *Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010, at *5 (Del. Ch. Aug. 30, 2019) (dismissing an implied covenant claim because plaintiff "does not allege the implied covenant fills a gap, nor . . . any misuse of a granted discretionary power"). In *Fortis Advisors*, this Court dismissed an implied covenant claim because the plaintiff had failed to "identif[y] an ambiguity or potential gap in a contract that could be filled by the implied covenant," and noted that the "right to

---

[54] Buyer's Ans. Br. in Opp'n to Mot. to Dismiss 49–50.

plead alternative claims . . . does not obviate the need to provide factual support for each theory." *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *5 (Del. Ch. Jan. 30, 2015) (internal citations omitted). The same rationale holds here, and the implied covenant claim is therefore dismissed.

### 2. Buyer's Fraud Claims

Although Buyer cannot assert breach of contract claims against Sellers based upon any misrepresentations by the Company, Delaware law recognizes that a seller can, under certain circumstances, be held liable for fraud based on the company's misrepresentations. *Abry*, 891 A.2d at 1064; *Prairie Capital III, L.P. v. Double E. Hldg. Corp.*, 132 A.3d 35, 60–62 (Del. Ch. 2015); *ChyronHego Corp. v. Wight*, 2018 WL 3642132, at *10 (Del. Ch. July 31, 2018). The Buyer must, nevertheless, satisfy the heightened pleading standard for fraud. A key element of that analysis involves the extent to which a buyer has disclaimed reliance on representations, thus negating an essential element of a claim for fraud. Here, Buyer has asserted two claims sounding in fraud: fraud, and fraudulent concealment.

### a. Fraud (Count II)

In Count II (Fraud), Buyer alleges that Sellers "including by and through Hansen, the Company's then CFO and a Manager of Sellers, made false and

28

misleading statements of material facts concerning the calculation of Closing Net Working Capital and/or actively concealed such material facts."[55]

To state a claim for fraud, Buyer must plead: (1) that Counterclaim Defendants made a false representation, usually one of fact; (2) with the knowledge or belief that the representation was false, or with reckless indifference to the truth; (3) with an intent to induce Buyer to act or refrain from acting; (4) that Buyer's action or inaction was taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of Buyer's reliance on the representation. *Fortis Advisors*, 2015 WL 401371, at *6; *accord GreenStar IH Rep, LLC v. Tutor Perini Corp.*, 2017 WL 5035567, at *10 (Del. Ch. Oct. 31, 2017), *aff'd*, 186 A.3d 799 (Del. 2018) (TABLE). To plead fraud, Buyer must also satisfy the heightened pleading standard of Court of Chancery Rule 9(b). Rule 9(b) states that "the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." Ct. Ch. R. 9(b). "Speculative conclusions unsupported by fact do not allege fraudulent conduct." *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 210 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007).

---

[55] Countercl. ¶ 34.

Buyer's fraud claims are based on the Interim Financial Statements and the Preliminary Closing Statement. According to Buyer, Counterclaim Defendants knowingly provided false representations about the Company's financial condition in the Interim Financial Statements and the Preliminary Closing Statement, which induced Buyer to enter into the Purchase Agreement.

### i. Fraud Claims Based upon the Interim Financial Statements

Buyer's fraud claim arising from alleged misrepresentations in the Interim Financial Statements are not barred by the terms of the Purchase Agreement. The Interim Financial Statements are the subject of a contractual representation that the parties agreed Buyer relied on in entering into the Purchase Agreement. Section 2.6 states that the Buyer has not relied on any representation or warranty "except as expressly and specifically set forth in Article III . . . and Article IV."[56] In Article IV, Section 4.6(a) of the Purchase Agreement, the Company represented that the Interim Financial Statements would "fairly present[], in all material respects, the consolidated or combined financial positions and results of operations of the Company."[57] Even though Section 4.6(a) relates to a representation and warranty provided by the Company, Sellers may nevertheless be liable for the Company's

---

[56] Purchase Agreement § 2.6.

[57] *Id.* § 4.6(a).

fraudulent misrepresentations in a contractual representation or warranty. *See Abry*, 891 A.2d at 1064 (holding that sellers may be held liable for fraud arising from the company's contractual representations and warranties); *Prairie Capital*, 132 A.3d 35 at 60–62 (discussing the same).

Counterclaim Defendants acknowledge the foregoing principles and concede that Buyer's fraud claim arising from alleged misrepresentations in the Interim Financial Statements "could theoretically survive the contractual terms."[58] Counterclaim Defendants argue, however, that Buyer has not pleaded fraud with the requisite particularity.[59] As the Court observed in *Prairie Capital*, "[w]hen a party sues based on a written representation in a contract . . . it is relatively easy to plead a particularized claim of fraud" because:

> The plaintiff can readily identify who made what representations where and when, because the specific representations appear in the contract. The plaintiff likewise can readily identify what the defendant gained, which was to induce the plaintiff to enter into the contract. Having

[58] Sellers' Reply Br. in Supp. of. Mot. to Dismiss 16 n.14 ("The Counterclaim Defendants have maintained that Cohen's fraud claims related to the Interim Financial Statements are not expressly precluded by the Purchase Agreement and therefore may be considered by the Court, but should be dismissed because they are not adequately pleaded."). The parties did not argue, and this Opinion does not address, whether the fraud claim arising from the Interim Financial Statements is barred as a consequence of the parties' agreement that all representations and warranties terminate upon closing. *See Pilot Air Freight, LLC v. Manna Freight Systems, Inc.*, 2020 WL 5588671, at *20–21 (Del. Ch. Sept. 18, 2020) (rejecting "heretofore-uncharted" argument that expiration of a survival provision regarding representations and warranties precluded fraud claim based on expired representation because the contract contained a provision "preserv[ing the] right to bring intentional fraud claims at any time") (internal quotations omitted).

[59] Sellers' Reply Br. in Supp. of. Mot. to Dismiss 2, 15–21.

pointed to the representations, the plaintiff need only allege facts sufficient to support a reasonable inference that the representations were knowingly false.

*Prairie Capital*, 132 A.3d at 62; *see also Abry*, 891 A.2d at 1064 (holding that a party may obtain damages where the buyer can show that "the Seller knew that the [Company's] contractual representations and warranties were false"); *id.* at 1050 ("While knowledge may be pled generally, when a plaintiff pleads a claim of fraud that charges that the defendants knew something, it must allege sufficient facts from which it can reasonably be inferred that this 'something' was knowable and that the defendants were in a position to know it.").

The Counterclaims allege that Sellers committed fraud through the Interim Financial Statements by (1) failing to record a reserve for Moviepass; and (2) wrongfully excluding the Management Bonus Liabilities, the Medical Claim Liabilities, and the Miscellaneous Liabilities.[60] As discussed below, Sellers have not stated a claim for fraud arising from Sellers' alleged conduct regarding Moviepass or the Miscellaneous Liabilities. The Counterclaims, however, do state a claim that

---

[60] The Counterclaims do not allege that the outstanding checks were fraudulently omitted from the Interim Financial Statements because it appears that they were included in those statements. *See* Countercl. ¶¶ 13–15 (alleging that the outstanding checks were included in the 2017 audited financial statements and the Company's 2018 balance sheet); Purchase Agreement § 4.6(a) (defining the "Balance Sheet" as the "unaudited combined consolidated balance sheet of the Company and its Subsidiaries, as of October 25, 2018" and the "Interim Financial Statements" as "the combined consolidated statements of operations of the Company and its Subsidiaries, for the twelve (12) months ended December 28, 2017 and the ten (10) months ended October 25, 2018").

32

Sellers acted fraudulently by excluding the Management Bonus Liabilities and the Medical Claim Liabilities from the Interim Financial Statements.

<blockquote>

**a.**   **Claims Based upon the Failure to Record a Reserve for Moviepass**

</blockquote>

Buyer alleges that Counterclaim Defendants committed fraud because the Company failed to record a reserve for the Moviepass accounts receivable in the Interim Financial Statements. Setting a reserve is a matter of judgment that "requires management to perform a series of ongoing estimates using its best judgment." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 574 (Del. Super. 2005). To state a claim of fraud relating to statements about a company's expected future financial performance, it is necessary to plead "contemporaneous fact[s] supporting an inference [defendant] knew its statements were false when made or lacked a good faith belief in their truth." *Mooney v. E.I. du Pont de Nemours and Co.*, 2017 WL 5713308, at *6 (Del. Super. Nov. 28, 2017).

In support of its claim that Sellers acted fraudulently by failing to record a reserve for Moviepass, Buyer alleges that (1) "there was a decline in payments that the Company received from Moviepass in the months prior to the closing"; (2) the Company's "practice [was] to estimate reserves for doubtful accounts"; and (3) "[i]n internal email correspondence prior to the Closing the Company made clear its

33

concern regarding the Moviepass receivable."[61]  In its briefing, Buyer argues that its "reference to intracompany emails" reflecting knowledge of risks relating to the Moviepass accounts receivable is sufficient to plead a claim of fraud.[62]

These allegations are not sufficient to sustain a claim of fraud arising from an estimate of the Company's future financial performance.  The Counterclaims are conspicuously devoid of any allegation linking Sellers to the Company's "concern" regarding Moviepass, as allegedly reflected in Company emails.[63]  The Counterclaims also do not contain particularized allegations regarding the timing or

---

[61] Countercl. ¶¶ 7–11.

[62] Buyer's Ans. Br. in Opp'n to Mot. to Dismiss 33.

[63] At oral argument, when confronted with the absence of additional facts regarding the emails in Buyer's possession evidencing the Company's "concern" regarding Moviepass, Buyer argued that, "to the extent the fraud claim as to Moviepass is dismissed, perhaps it would be dismissed without prejudice to repleading."  Oral Arg. Tr. at 43–44 (arguing that "we certainly can plead that these emails were post-closing, that these were not . . . something that we could have discovered prior to the closing, because they were not made available to us").  Dismissal without prejudice with leave to amend is not appropriate here. Buyer stood on its Amended Counterclaims by filing an answering brief pursuant to Court of Chancery Rule 15(aaa), and Buyer has not established good cause for the Court to provide leave to amend. *See Mooney*, 2017 WL 5713308, at *8 ("The parties went through full briefing and argument, yet Mooney did not once identify any additional allegations that might bolster his claim. Mooney's failure to identify any misstatements of fact on which he relied or any contemporaneous fact suggesting DuPont's statements were false when made are not defects easily resolved through an amended complaint. If Mooney possessed such facts, he had ample opportunity to identify them."); *see also Larkin v. Shah*, 2016 WL 4485447, at *21 (Del. Ch. Aug. 25, 2016) ("Plaintiffs' conditional request to amend is not a procedurally proper motion to amend.  More importantly, Plaintiffs have not shown, or even attempted to show, good cause as to why dismissal with prejudice would be unjust.").

magnitude of Moviepass's deterioration, nor do they allege any fact from which the Court could reasonably infer that Sellers knew that the Company would no longer receive any payments owed by Moviepass. On the contrary, while not dispositive, Buyer's Final Closing Statement reflected a 50% reserve against the outstanding Moviepass balance, indicating that the Buyer believed the Company reasonably expected to obtain at least some payments from Moviepass and that the amount of any reserve remained a question of judgment.[64] Because Buyer has not pleaded "contemporaneous fact[s] supporting an inference [defendant] knew its statements were false when made or lacked a good faith belief in their truth," the fraud claim relating to the Moviepass receivable fails. *Mooney*, 2017 WL 5713308, at *6.

---

[64] Comparing the allegations in the Counterclaims to the allegations in *Anschutz Corp. v. Brown Robin Capital, LLC*, 2020 WL 3096744 (Del. Ch. June 11, 2020), is instructive. In *Anschutz*, this Court denied a motion to dismiss a fraud claim based on "allegedly misleading entries in the interim financial statements" because the statements included accounts receivable from customers from which the company could no longer expect to receive payment. *See id.* at *12 (plaintiff alleging that the interim financial statements included accounts receivable from customers that had "disconnected all . . . services months earlier, were shutting down operations or were otherwise unwilling or unable to settle their accounts"). In *Anschutz*, plaintiff pleaded factual circumstances from which it was reasonably inferable that the preparer of the interim financial statements knew that it would no longer receive payments from customers. By contrast, in the present case, Buyer has only alleged that Moviepass paid less to the Company at some point prior to closing, without any supporting allegations.

### b. Claims Based upon the Management Bonus Liabilities, the Medical Claim Liabilities, and the Miscellaneous Liabilities

Buyer alleges that the Interim Financial Statements support a claim of fraud because Sellers knowingly excluded liabilities from the financial statements in order to induce Buyer to close. As noted above, "it is relatively easy to plead a particularized claim of fraud" "based on a written representation in a contract," because the allegedly false contractual representation satisfies much of the requirement to plead a claim of fraud with particularity. *Prairie Capital*, 132 A.3d at 62. The only remaining allegations necessary are "facts sufficient to support a reasonable inference that the representations were knowingly false." *Id.* In *Abry Partners*, the Court held that, to plead knowledge in this context, the plaintiff must "allege sufficient facts from which it can reasonably be inferred that [the falsity] was knowable and that the defendants were in a position to know it." *Abry*, 891 A.2d at 1050. "Generally, it may be said that an allegation of fraud is legally sufficient under Rule 9(b) if it informs defendants of the precise transactions at issue, and the fraud alleged to have occurred in those transactions, so as to place defendants on notice of the precise misconduct with which they are charged." *Kahn Bros. & Co., Inc. Profit Sharing Plan & Tr. v. Fischbach Corp.*, 1989 WL 109406, at *4 (Del. Ch. Sept. 19, 1989) (internal citations omitted); *accord Bamford v. Penfold, L.P.*, 2020 WL 967942, at *12 (Del. Ch. Feb. 28, 2020). "Given that state of mind and knowledge

may be averred generally when pleading fraud, an allegation that a contractual representation is knowingly false typically will be deemed well pled (even if ultimately difficult to prove)." *Pilot Air Freight*, 2020 WL 5588671, at \*24.

Under the circumstances of this case, the Counterclaims have pleaded a claim of fraud arising from the failure to include the Management Bonus Liabilities and the Medical Claim Liabilities in the Interim Financial Statements, which the Company represented and warranted "fairly present[ed], in all material respects, the consolidated or combined financial positions and results of operations of the Company" at Section 4.6(a) of the Purchase Agreement. Buyer has alleged that the Interim Financial Statements wrongly excluded "merit increases for certain field management personnel . . . based upon defined goals and milestones, as well as incentives based on performance targets."[65] The Counterclaims allege that incentive bonuses in 2018 approximated $750,000, and merit increases effective in 2019 approximated $144,000.[66] Similarly, the Counterclaims allege that Sellers knew of the Medical Claim Liabilities prior to the closing of the transaction, which approximated $500,000.[67]

---

[65] Countercl. ¶ 25.

[66] *Id.*

[67] *Id.* ¶ 26.

These liabilities were "knowable," and given Hansen's role as the CFO of the Company and as the Manager of Sellers, as well as the nature and magnitude of the liabilities, it is reasonably inferable that Hansen was in a position to know of these liabilities excluded from the Interim Financial Statements. *Abry*, 891 A.2d at 1050 (holding that knowledge is adequately pleaded where the claimant alleges "sufficient facts from which it can reasonably be inferred that [the false information] was knowable and that the defendants were in a position to know it"); *EMSI Acq., Inc. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *13 (Del. Ch. May 3, 2017) (quoting the same and rejecting an argument to adopt a "more stringent pleading standard for common law fraud"); *see also Prairie Capital*, 132 A.3d at 59–61 (holding that the sellers and the directors of the sellers may be liable, at the pleading stage, for representations made by the company in a contract). Although the allegations supporting Buyer's claims for fraud arising from the Management Bonus Liabilities and the Medical Claim Liabilities are thin, they are sufficient to plead a claim under Court of Chancery Rule 9(b).

Buyer's fraud claims arising from the failure to include the Miscellaneous Liabilities in the Interim Financial Statements, however, do not cross the Rule 9(b) threshold. In Paragraph 26 of the Counterclaims, Buyer alleges:

> Likewise, Defendant subsequently learned of medical claim liabilities, which were known to Sellers prior to closing, of roughly $500,000; of under-accrued state income taxes of roughly $175,000; of expense reports of roughly $60,000; and, an inter-company write-off of a

38

receivable from Magnolia in an amount of roughly $40,000, among others. These items expressly should have been included as part of the Preliminary Closing Statement because it was within the standard practice of the Company prior to the Closing to include such items in the Company's financial statements, and certainly should have been included as part of the Company's interim financial statements. None of them were included.[68]

There are no additional substantive allegations as to the Miscellaneous Liabilities. In sum, Buyer alleges that there were a few miscellaneous line items that were not included in the Interim Financial Statements that should have been included. That is not enough to state a claim for fraud. Buyer does not allege that Sellers knew of the under-accrued state income taxes, expense reports, or write-off.[69] Because the Counterclaims do not allege that Sellers knew of the Miscellaneous Liabilities, a fraud claim cannot survive regarding their purported omissions from the Interim Financial Statements.

### ii. The Fraud Claim Based upon the Preliminary Closing Statement

The parties sharply dispute whether Buyer has disclaimed reliance upon the Preliminary Closing Statement under Section 2.6 of the Purchase Agreement. Even assuming that Buyer has not disclaimed reliance upon the Preliminary Closing Statement, however, Buyer has not adequately pleaded a claim of fraud arising from

---

[68] Countercl. ¶ 26.

[69] *Id.*

the accounting treatment of the outstanding checks, which is the only category of alleged financial misrepresentation unique to the Preliminary Closing Statement and that this Opinion has not already resolved.[70] Under the Purchase Agreement, the parties agreed that the calculation of the Company's Net Working Capital would "include only those accounts and line items set forth in the Sample Statement."[71] Account #1000-035 was not included in the list.[72] Because Buyer agreed that Account #1000-035 would not be included in calculations of Net Working Capital, Buyer cannot now claim that it was defrauded by the exclusion of that account. *Abry*, 891 A.2d at 1058 ("For the plaintiff in such a situation to prove its fraudulent

---

[70] *See supra* n.59 (discussing the inclusion of outstanding checks in the Interim Financial Statements).

[71] Applicable Accounting Principles § 1.3(a) at Specific Policy (e). Buyer also agreed that the Specific Policies, which require the accounts in the Sample Statement to be used to calculate Net Working Capital, would govern in the event of any conflict between the Specific Policies and the Interim Financial Statements. Applicable Accounting Principles § 1.3(a) ("For the avoidance of doubt, in the event of any conflict . . . section (ii) shall take precedence over sections (iii) and (iv)[.]"). Section (ii) requires the Preliminary and Final Closing Statements to be prepared in accordance with the Specific Policies. *Id.* Section (iii) requires the Preliminary and Final Closing Statements to be prepared in accordance with the Interim Financial Statements "to the extent not addressed in section (ii)." *Id.* The Specific Policies state that "[t]here should be no change in the classification . . . to a current liability of any liability that has not previously been characterized as a current liability." *Id.* The Sample Statement contained specific account numbers and a description of each and whether each account was or was not included in "Working Capital." Purchase Agreement Ex. A.

[72] Even if Sellers subsequently determined that the outstanding checks in Account #1000-035 were not classified correctly, the parties agreed that Sellers could not reclassify "any liability that has not previously been characterized as a current liability" "to a current liability." Applicable Accounting Principles § 1.3(a) at Specific Policy (e).

inducement claim, it proves itself not only a liar, but a liar in the most inexcusable of commercial circumstances: in a freely negotiated written contract . . . . To allow the buyer to prevail on its claim is to sanction its own fraudulent conduct."). Further, as discussed below, there is no well-pleaded allegation that Sellers concealed Account #1000-035 from Buyer, or that Buyer was prevented from obtaining due diligence regarding Account #1000-035. Buyer's claim for fraud arising from the outstanding checks therefore fails.

Buyer's fraud claim based on the Preliminary Closing Statement fails for the independent reason that Buyer agreed that it was not relying on any statement, representation, or warranty by the Sellers or the Company except as set forth in Article III and Article IV.[73] Section 2.6 expressly states that Buyer has "not relied and is not relying on any statement (including by omission), representation or warranty . . . except as expressly and specifically set forth in Article III (as modified by the Company Disclosure Letter) . . . and Article IV (as modified by the Company Disclosure Letter)."[74] The parties further agreed that Sellers disclaimed liability based on "any and all liability that may be based on . . . information or errors . . . or omissions" from any representations outside of Articles III and IV, as modified by

---

[73] Purchase Agreement § 2.6.

[74] *Id.*

41

the Company Disclosure Letter.[75]  The Preliminary Closing Statement is neither

referenced in nor part of any representation or warranty by the Sellers in Article III

or the Company in Article IV, as those articles are modified by the Company

Disclosure Letter.[76]  Thus, by the contract's terms, Buyer agreed that it was not

relying on the Preliminary Closing Statement and cannot claim justifiable reliance

on it.

Delaware law enforces such agreements.  *Abry Partners* analyzed Delaware

jurisprudence on anti-reliance clauses and held that "this court has . . . honored

contracts that define those representations of fact that formed the reality upon which

the parties premised their decision to bargain."  *Abry*, 891 A.2d at 1058; *see also*

*Prairie Capital*, 132 A.3d at 51 ("If a party represents that it only relied on particular

information, then that statement establishes the universe of information on which

that party relied."); *FdG Logistics LLC v. A&R Logistics Hldgs., Inc.*, 131 A.3d 842,

858 (Del. Ch. 2016) ("Delaware law enforces clauses which identify the specific

---

[75] *Id.*  Section 2.6 contains language disclaiming claims arising from omissions and, as a result, Buyer's claims relating to allegedly fraudulent omissions are barred.  *See Pilot Air Freight*, 2020 WL 5588671, at *22 n.215 (discussing disclaimer of fraudulent omission claims).  That is not to say, however, that express language disclaiming claims based on omissions is required to preclude a claim based upon an alleged omission.  *See Prairie Capital*, 132 A.3d at 52–55 (holding an exclusive presentations clause need not "use magic words like 'omissions'" to preclude claims based upon alleged omissions).

[76] Buyer does not argue that the Preliminary Closing Statement is part of any representation in Article III or IV, as modified by the Company Disclosure Letter, and has waived any argument to the contrary.

information on which a party has relied and foreclose reliance on other information."); *ChyronHego*, 2018 WL 3642132, at \*1 ("Where the parties in language that is clear provide that they eschew reliance on any facts but those recited, they will be held to that representation, notwithstanding prior knowingly false statements made by one party to the other."). Accordingly, "[t]he net effect of an enforceable non-reliance provision and carefully negotiated representations and warranties"—both elements of which are present in the Purchase Agreement—"is to define what information the Buyer relied upon in deciding to execute the [contract]." *Pilot Air Freight*, 2020 WL 5588671, at \*23 (internal quotations omitted).

Buyer does not contend that the contractual language is not sufficiently specific to preclude any claim that Buyer relied on representations and warranties outside of Articles III and IV. Rather, Buyer argues that Delaware law generally does not permit disclaimer of any representation "within" the contract and that it was entitled to rely on the Preliminary Closing Statement. Buyer's Ans. Br. in Opp'n to Mot. to Dismiss 36 (quoting *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 117 (Del. 2012)). Buyer's argument appears to be that, under Delaware law, parties to a contract cannot disclaim reliance on any document referenced in the contract.

This argument fails for multiple reasons. First, *RAA* does not stand for the proposition that the parties may not disclaim reliance upon any document referenced

43

in the contract. In *RAA*, the Delaware Supreme Court considered a non-disclosure agreement in which a company represented that it was not making "any representation or warranty" regarding information provided to a prospective purchaser through due diligence. *RAA*, 45 A.3d at 110.[77] The parties had "terminated negotiations . . . before the parties executed a final sale agreement." *Id.* at 109. *RAA* quoted *Abry Partners* for the proposition that "fraud claims based on 'false representation[s] of fact made within the contract itself' . . . cannot be disclaimed." *Id.* at 117. In both *RAA* and *Abry Partners*, however, the anti-reliance clauses drew the dividing line at the four corners of the contract, and those cases analyzed the effect of the anti-reliance clauses consistent with their express terms.[78] *RAA* and *Abry* do not, as Buyer argues, impose a broader rule that parties to a contract may not disclaim reliance on anything "within" the contract, regardless of

---

[77] In *RAA*, the Delaware Supreme Court "assume[d] that New York law applies, but conclude[d] that the outcome would be the same under Delaware law." *RAA*, 45 A.3d at 112.

[78] *RAA*, 45 A.3d at 110 ("Only those representations or warranties that are made to a purchaser in the Sale Agreement . . . shall have any legal effect."); *Abry*, 891 A.2d at 1041 ("Acquiror . . . agrees that neither the Company nor the Selling Stockholder has made any representation or warranty . . . except as expressly set forth in this Agreement").

the language of the parties' anti-reliance provision.[79]

Second, permitting Buyer to rely on a document outside Articles III and IV would render the references to Articles III and IV in the anti-reliance provision surplusage, effectively requiring the Court to rewrite the parties' agreement as to the universe of contractual representations that Buyer relied upon. Buyer has not cited any case in which the Court has done so. *See Osborn*, 991 A.2d at 1159 ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage. We will not read a contract to render a term meaningless or illusory.") (internal quotations and citations omitted).

Third, adopting Buyer's reasoning and abandoning the parties' agreed-upon definition of the representations and warranties in the Purchase Agreement would defeat the purpose of anti-reliance clauses. As the Court held in *Abry*, "[t]his sort of definition minimizes the risk of erroneous litigation outcomes by reducing doubts about what was promised and said, especially because the contracting parties have

---

[79] In this context, terms such as "extra-contractual" can be viewed as distinguishing between the information that a party has agreed it relied upon in entering into the contract, and the information that the contracting parties agreed that a party has not relied upon. *See, e.g.*, *ChyronHego*, 2018 WL 3642132, at *4–5 (discussing "extra-contractual" representations and warranties in the context of "clauses that identify the specific information on which a party has relied") (internal citations omitted); *see also FdG Logistics*, 131 A.3d at 858 ("Delaware law enforces clauses which identify the specific information on which a party has relied and foreclose reliance on other information.") (citing *RAA*, 45 A.3d at 116–17). Buyer's position would restrict generally the parties' ability to disclaim reliance upon the representations and warranties of their choosing.

defined that in writing in their contract." *Abry*, 891 A.2d at 1058. Permitting Buyer to advance a fraud claim based on the Preliminary Closing Statement would introduce the exact kind of uncertainty that anti-reliance clauses are intended to foreclose.[80] Thus, having disclaimed reliance upon the Preliminary Closing Statement, Buyer cannot now claim that it justifiably relied upon the Preliminary Closing Statement in entering into the Purchase Agreement. *See Abry*, 891 A.2d at 1058 (noting that failing to enforce anti-reliance clauses would "excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made"). Buyer's fraud claim arising from the Preliminary Closing Statement therefore is dismissed.

### b. Fraudulent Concealment (Count IV)

Count IV (Fraudulent Concealment) alleges that Counterclaim Defendants "deliberately concealed material facts from [Buyer] in relation to the calculation of Closing Net Working Capital and with respect to the financial position of the Company prior to or at closing." Countercl. ¶ 40.

To allege fraudulent concealment, the Buyer must allege that Counterclaim Defendants "took some action affirmative in nature designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim, some

---

[80] *See ChyronHego*, 2018 WL 3642132, at *7 (dismissing an "attempt to bootstrap a dog's breakfast of extra-contractual fraud claims onto contractual misrepresentations" because the alleged misrepresentations were outside the company's "ordinary course of business").

artifice to prevent knowledge of the facts or some representation intended to exclude suspicion and prevent inquiry." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 150 (Del. Ch. 2004) (internal citations omitted); *accord Corp. Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at *7 (Del. Ch. Apr. 10, 2008). As with fraud, to plead fraudulent concealment, Buyer must also satisfy the heightened pleading standard of Court of Chancery Rule 9(b).

Buyer's allegations of concealment are conclusory and lack particularity. *See*, *e.g.*, Countercl. ¶ 4 ("Sellers[,] including Hansen, . . . acted fraudulently so as to intentionally conceal financial information from Buyers [sic], with respect to the calculation of Closing Net Working Capital, so as to significantly *overstate* the Company's current assets, and, grossly *understate* its current liabilities."); ¶ 9 ("Upon information and belief, Sellers, including at the express direction of and by and through Hansen, and on behalf of the Company, intentionally concealed and withheld information concerning the degradation of the carrying value of the Moviepass account, from both the financial statements disclosed to [Buyer] prior to closing as well as from the Preliminary Closing Statement."); ¶ 10 ("In internal email correspondence prior to the Closing the Company made clear its concern regarding the Moviepass receivable. Thus, there was a degradation of the carrying value of the account prior to the Closing of which Sellers—and their CFO and Manager,

47

Hansen—were well aware, and yet intentionally ignored and/or withheld such information, including by failing to estimate a sufficient reserve for the Moviepass account in the financial statements furnished to [Buyer] prior to closing . . . ."); ¶ 17 ("Sellers, including by and through Hansen, intentionally withheld such information concerning the outstanding checks of which they were well aware at the time of closing . . . ."); ¶ 18 ("Sellers and Hansen obviously knew about the outstanding checks but intentionally and fraudulently did not advise and concealed them from Buyer, so as to understate the Company's Accounts Payable."); ¶ 25 ("Following the [Determination Letter], Buyer learned of additional bad faith conduct and fraud by Sellers who, upon information and belief, have intentionally concealed information that 'past practices' as well as unsigned agreements, provide for merit increases" and bonuses for certain management).

Buyer has not met its pleading burden as to any of the financial information forming the basis of the fraudulent concealment claim. Buyer does not allege with the required particularity a single fact of concealment. *See Bay Ctr. Apts. Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *12 (Del. Ch. Apr. 20, 2009) (dismissing fraudulent concealment claim based upon allegations that "defendants failed to share with [plaintiff] important information that the defendants knew by virtue of their positions as the day-to-day managers of the Project. But it cannot be reasonably inferred from the Complaint that the defendants made any effort to hide

48

this information from [plaintiff] through subterfuge or other artifice."); *cf. Swipe Acq. Corp. v. Krauss*, 2020 WL 5015863, at *3 (Del. Ch. Aug. 25, 2020) (sustaining fraud claim upon allegations that President and CEO told employees that if buyer learned of the impending loss of a major customer "the deal would be 'over'" and detailing how CEO orchestrated a due diligence call so as to limit buyer's ability to learn of the loss of the major customer).

To be sure, before closing, the Buyer was provided with "full and complete access to the Representatives, properties, offices, plants and other facilities, books and records of the Company and its Subsidiaries and other information that they have requested in connection with their investigation of the Company and its Subsidiaries." Purchase Agreement § 2.6. After closing, Buyer owned the Company and its records, possessed its emails, and had access to its employees, yet Buyer has not alleged any specific act designed to prevent Buyer's discovery of the financial information underlying the fraud claim.[81] The particularity requirement of Rule 9(b) is "applied in light of the facts of the case, and less particularity is required when the facts lie more in the knowledge of the opposing party than of the pleading party." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 146 (Del. Ch. 2003). In light of the facts of this case, Buyer does not get the benefit of having to plead with "less

---

[81] *See* Oral Arg. Tr. at 43–44 (counsel for Buyer acknowledging Buyer's possession of the Company's emails).

49

particularity."  Nor can the Buyer satisfy its burden to plead with particularity by alleging an act of concealment based upon "information and belief."  Countercl. ¶¶ 9, 10, 25; *Metro Comm'cn*, 854 A.2d at 149 n.57; *Nutt v. A.C. & S., Inc.*, 466 A.2d 18, 23 (Del. Super. 1983), *aff'd sub nom. Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647 (Del. 1984); *cf. Wexford*, 832 A.2d at 146 (acknowledging that intent and knowledge pleaded upon information and belief can satisfy Rule 9(b)).

### B.    Sellers' Motion for Summary Judgment

Sellers have moved for summary judgment in their favor on all counts of their Complaint, which seeks an order confirming the Determination Letter as a binding arbitration award and for specific performance compelling release of the escrow pursuant to the Determination Letter.

Under Court of Chancery Rule 56, summary judgment may be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Ct. Ch. R. 56(c).  As with the motion to dismiss, the Court "must view the evidence in the light most favorable to the non-moving party."[82]  "A motion for summary judgment is the 'common [method] for this court to determine whether to vacate or confirm an arbitration award.'"  *TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Sec., Inc.*, 953 A.2d 726, 730 (Del. Ch. 2008)

---

[82] *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992).

(quoting *Beebe Med. Ctr., Inc. v. InSight Health Servs. Corp.*, 751 A.2d 426, 431 (Del. Ch. 1999)).

The parties agree that the Court's decision to confirm or vacate the Determination Letter is governed by the Federal Arbitration Act.[83] Under the Federal Arbitration Act, a court designated to confirm the award in the contract must grant an application to confirm the award "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11" of the FAA.[84] Buyer argues that the Determination Letter should be vacated pursuant to 9 U.S.C. § 10(a)(1) as an award "procured by . . . fraud, or undue means."[85]

Because Buyer has pleaded a claim for fraud arising from the Management Bonus Liabilities and the Medical Claim Liabilities, there is a material issue of fact preventing entry of summary judgment. Specifically, it is possible that the Determination Letter was procured by fraud to the extent that the omission of the Management Bonus Liabilities and the Medical Claim Liabilities from the Interim

---

[83] *See* Buyer's Ans. Br. in Opp'n to Summ. J. 38 ("Defendant's basis for seeking vacatur of the PwC Award is the FAA, 9 U.S.C. § 10(a)(1)"); Sellers' Reply Br. in Supp. of Summ. J. 1 (arguing that Buyer has not timely filed a motion to vacate and that Buyer has not demonstrated the award was procured by fraud).

[84] 9 U.S.C. § 9. The parties specified that "[j]udgment may be entered upon the written determination of the Independent Accounting Firm in accordance with Section 8.10." Purchase Agreement § 1.3(d). Section 8.10 is a forum selection clause selecting the Court of Chancery as the forum of first resort. *Id.* § 8.10.

[85] Buyer's Ans. Br. in Opp'n to Summ. J. 38–39.

Financial Statements formed part of the calculations relied upon by PwC in its Determination Letter.[86]  In addition, "further development of the factual record and the parties' legal arguments would help clarify the application of the law to the circumstances of the case." *Bouchard v. Braidy Indus., Inc.*, 2020 WL 2036601, at *16 (Del. Ch. Apr. 28, 2020).[87]  Accordingly, the Motion for Summary Judgment is denied without prejudice.

---

[86] It is not clear from the limited record before the Court to what extent PwC evaluated the Management Bonus Liabilities and Medical Claim Liabilities before issuing the Determination Letter.  Buyer alleges that the Management Bonus Liabilities and Medical Claim Liabilities were "learned of" "following the [Determination Letter]." Countercl. ¶¶ 25–26.  At page 14 of the Determination Letter, however, Buyer appears to have disputed "[a]n underaccrual of accounts payable related to medical claims." Determination Letter 14.  PwC ruled in the Sellers' favor on this issue because the medical claim liabilities referenced in the Determination Letter were not included in the Final Closing Statement. *Id.* at 14–15.  As discussed above, additional development of the facts will assist the Court in determining whether summary judgment is appropriate for confirmation of the Determination Letter.

[87] In their Reply Brief in Support of their Motion for Summary Judgment, Sellers argued, for the first time, that Buyer did not timely file a motion to vacate the Determination Letter because Buyer did not file a motion to vacate the Determination Letter within 90 days pursuant to 9 U.S.C. § 12.  The Court recognizes that this issue arose in an awkward procedural context due to the Buyer's filing of amended counterclaims and altering its legal theory after Sellers filed their opening brief.  Nevertheless, because Sellers raised the issue for the first time in their reply brief, Buyer did not have the opportunity to respond in its Answering Brief.  "Normally, this court does not entertain arguments raised for the first time in a reply brief." *Pryor v. IAC/InterActiveCorp.*, 2012 WL 2046827, at *6 n.71 (Del. Ch. June 7, 2012). Having determined that there is a genuine issue of material fact preventing summary judgment, the Court concludes that the Buyer should be permitted to appropriately address the procedural challenge to its attempt to vacate the Determination Letter pursuant to 9 U.S.C. § 12.

### III. CONCLUSION

For the foregoing reasons, the Counterclaim Defendants' Motion to Dismiss the Counterclaims is granted as to Counts I, IV, and V, and granted in part and denied in part as to Count II. Plaintiffs' Motion for Summary Judgment is denied without prejudice.

**IT IS SO ORDERED.**